CURRAN CONTRACTING COMPANY, Plaintiff-Appellee, v. WOODLAND HILLS DEVELOPMENT COMPANY, d/b/a Townhomes of Woodland Hills, *et al.*, Defendants-Appellants.

Second District   No. 2—91—0853

Opinion filed June 5, 1992.—Modified on denial of
rehearing October 23, 1992.

Eugene A. DiMonte and Riccardo A. DiMonte, both of DiMonte & Lizak, of Park Ridge (G.F. Gallagher, of counsel), for appellant Gus Leakakos.

David W. McArdle, of Zukowski, Rogers, Flood & McArdle, of Crystal Lake (Dolores A. Duffy, of counsel), for appellee.

JUSTICE BOWMAN delivered the opinion of the court:

In this breach of contract case, defendants, Woodland Hills Development Company (Woodland), Gus Leakakos (Leakakos) and American National Bank & Trust Company of Chicago (American National), appeal from a judgment entered by the circuit court of Lake County in favor of plaintiff, Curran Contracting Company (Curran), in the amount of $107,466.90. Defendants raise three issues on appeal: (1) whether the trial court erred in allowing testimony from a previously undisclosed witness; (2) whether the court erred in allowing extrinsic evidence contrary to the terms of express contracts; and (3) whether plaintiff failed to sustain its burden of proof on its claim for contract extras.

Primarily at issue in this case is work done by Curran in its capacity as a subcontractor for defendants Leakakos and Woodland. Curran is a Delaware corporation authorized to do business in Illinois. Curran supplies labor and materials for the construction of roads, driveways, parking lots and other asphalt paving projects. Leakakos is the principal shareholder of Woodland. Woodland is an Illinois corporation and is primarily engaged in the business of construction and real estate development. Among the development projects undertaken by Woodland was the Townhomes of Woodland Hills Project in Gurnee, Illinois, in which Woodland was the general contractor. Curran

was chosen as the subcontractor to do the paving work on the project. The property in question is owned in trust by American National.

In 1985, Curran entered into a written contract to pave certain roads in what was known as "Phase I" (Phase I) of the Townhomes of Woodland Hills Project. In 1986, Curran entered into an oral contract to pave roads in "Phase III" of the project, and in 1987 it entered into a written contract to pave "Phase II" of the project.

Curran's second amended complaint, under which this case was tried, included seven counts. Count I was against Leakakos for breach of an oral agreement for Phase III extras. Count II was against Leakakos for breach of the oral contract for Phase III paving. Count III realleged the same allegations as counts I and II against Woodland. Count IV was against Leakakos and Woodland under a *quantum meruit* theory for patching a damaged Phase III roadway. Count V was against Leakakos for breach of the written Phase II contract. Count VI realleged the same allegations as count V against Woodland. Count VII was against Leakakos and Woodland under a *quantum meruit* theory for Phase II extras. Curran did not allege any breach of the Phase I contract. Curran subsequently filed a third amended complaint to conform to the proofs submitted at trial. We note that the third amended complaint did not reference the claim for Phase II extras contained in count VII of the second amended complaint. This allegation was not presented to the jury, nor did the jury render a verdict in this regard.

Following trial, the jury returned verdicts in favor of Curran on counts I, II, III, V and VI. The jury found in favor of Leakakos and Woodland on count IV. Curran then elected to have judgment entered on counts I, II and V against Leakakos and not to have judgment entered on counts III and VI against Woodland. The trial court therefore entered judgment in favor of Curran in the amount of $28,742.43 on count I; in the amount of $17,484.59 on count II; and in the amount of $52,280.80 on count V. Pursuant to an agreed order, judgment was also entered for the interest awarded under count V in the amount of $8,959.08, reflecting interest from October 1, 1987, through the date of judgment, March 6, 1991. Defendants appeal from the trial court's order entering judgment on the jury's verdicts and also from the order denying defendants' post-trial motion.

We first consider defendants' contention that the trial court erred in allowing testimony from a previously undisclosed witness. Specifically, defendants argue that the court erred in allowing the testimony of Bill Curran, the president of Curran Contracting Company. Defendants maintain that whether Bill Curran is classified as an occurrence

witness or as an expert witness his testimony should not have been allowed since Curran failed to disclose his identity prior to trial. Curran argues that this witness was not an expert witness and therefore disclosure was not required under Supreme Court Rule 220 (134 Ill. 2d R. 220). Curran also argues that disclosure was not mandated under Rule 213 (134 Ill. 2d R. 213) and that debarment was not required under Rule 219 (134 Ill. 2d R. 219).

■■ We first address whether Bill Curran's testimony should have been barred under Rule 219. In this regard, defendants argue that, since they propounded interrogatories to plaintiff requesting the identities of those people with knowledge of the facts surrounding this dispute, but plaintiff's answers thereto did not disclose Bill Curran's name, the witness' testimony should not have been allowed. Curran argues that Bill Curran was an occurrence witness, but that disclosure of his identity under Rule 213 was not required because at the time it responded to the interrogatories the identity of Bill Curran, as a person with knowledge of facts contained in the complaint, was not known. Rather, Curran suggests that the witness only obtained this knowledge one month prior to trial when he measured the pavement at the project site.

It is true, as Curran points out, that under Supreme Court Rule 213(e) (134 Ill. 2d R. 213(e)) it was under no obligation or duty to supplement answers to interrogatories that had been answered in good faith and were complete when made. (*Magnone v. Chicago & North Western Transportation Co.* (1984), 126 Ill. App. 3d 170, 178.) However, Bill Curran did not only testify as to measurements taken by him one month prior to trial. The record indicates that he also reviewed the construction plans from which Curran's bid was derived. He reviewed all the written contracts entered into on Phases I and II and the engineer's estimate on Phase III of the project. He also reviewed the total quantities of asphalt billed by Curran to Woodland, as compared to the quantities listed in the contracts. With this in mind, and considering the fact that Bill Curran is the president of Curran Contracting and has been with the company for 35 years, we tend to agree with defendants that it defies common sense to conclude that Bill Curran was not a person with knowledge of facts alleged in the complaint and further that Curran was not aware of his identity at the time the interrogatories were answered. We therefore conclude that Bill Curran was a witness who should have been disclosed under Rule 213. That being the case, we must next determine the proper sanction, if any, for failure to comply with a discovery rule.

■ Under Rule 219 several factors are usually considered in determining whether the exclusion of a witness is an appropriate sanction for nondisclosure. These factors include: (1) the surprise to the adverse party; (2) the prejudicial effect of the testimony; (3) the nature of the testimony; (4) the diligence of the adverse party; (5) the timely objection to the testimony; and (6) the good faith of the party calling the witness. (*Ashford v. Ziemann* (1984), 99 Ill. 2d 353, 369; *Phelps v. O'Malley* (1987), 159 Ill. App. 3d 214, 224.) In our view, consideration of these factors fails to demonstrate an abuse of discretion on the part of the trial judge in this case.

■ First, while defendants may have been surprised by the person of Bill Curran being called to testify, we do not believe they were surprised by the substance of his testimony. Curran correctly points out that Leakakos admitted at trial that he knew Curran had measured the area it paved on all three phases of the project. In addition, it was Curran's theory all along that it was required to pave areas beyond those specified in the contracts.

Second, and we believe most importantly, Bill Curran's testimony was not especially prejudicial. Although defendants argue that the testimonial evidence provided by Bill Curran, that the labor and material provided the project by plaintiff was in excess of what was called for in an early set of engineer's plans, was not available from any other witnesses, the record belies this assertion. As Curran indicates, much of Bill Curran's testimony was cumulative. For example, Leakakos and Charles Gaumer, a Curran estimator/project representative, both testified that areas outside those listed on the 1984 engineer's plans were paved by Curran and that all the contracts were based on the 1984 plans which were later changed. Invoices, which provided the measurements of the paved areas, were also introduced into evidence. George Loser, a Curran job foreman, testified as to extra areas in front of townhome garages that were paved, and Leakakos admitted that garages not on the 1984 plans were added during construction.

Third, the nature of Bill Curran's testimony, although clearly central to Curran's contract claims, is also, as stated above, cumulative and thus not such that it should automatically have been stricken or barred. The fourth factor is the diligence of the adverse party, and we believe defendants, by requesting the identities of persons having knowledge of the allegations in the complaint, satisfied this requirement. The fifth factor, timely objection, also weighs in defendants' favor. Defendants objected to Bill Curran's testimony at trial and addressed the issue in a post-trial motion. Curran's argument, that

defendants in effect waived any objection by failing to depose the witness during the lunch-time recess, as suggested by the trial judge, and by failing to renew their objection after the recess, is not well taken. Both the supreme court and this court have disapproved of the procedure of adjourning trial while a witness is deposed. (*Ashford*, 99 Ill. 2d at 370; *Phelps*, 159 Ill. App. 3d at 225-26.) Finally, we do question the good faith of Curran's claim that the identity of the witness, the president of the company, was not known at the time the interrogatories were answered.

Thus, while several of the above factors weigh in defendants' favor, the most important factors, including surprise, prejudice and nature of the testimony, weigh in Curran's favor. Barring a witness from testifying is a drastic sanction and should be exercised sparingly. (*Palmer v. Minor* (1991), 211 Ill. App. 3d 1083, 1087.) Under the circumstances of this case, we do not believe such a sanction is warranted under Rule 219.

Defendants also argue, however, that Bill Curran was an expert witness whose disclosure was required under Supreme Court Rule 220 (134 Ill. 2d R. 220). Supreme Court Rule 220(a)(1) defines "expert" as follows:

> "An expert is a person who, because of education, training or experience, possesses knowledge of a specialized nature beyond that of the average person on a factual matter material to a claim or defense in pending litigation and who may be expected to render an opinion within his expertise at trial. He may be an employee of a party, a party, or an independent contractor." 134 Ill. 2d R. 220(a)(1).

Rule 220(b)(1) provides that "the identity of an expert who is retained to render an opinion at trial *** must be disclosed" (134 Ill. 2d R. 220(b)(1)) and " 'obliges litigants to disclose the identity and opinions only of those witnesses who are engaged for the purpose of giving an expert opinion at trial' " (*Hill v. Ben Franklin Savings & Loan Association* (1988), 177 Ill. App. 3d 51, 57, quoting *Tzystuck v. Chicago Transit Authority* (1988), 124 Ill. 2d 226, 234).

In *Hill*, this court stated that "a party to a suit cannot be said to be retained to render an opinion at trial. A party is not engaged for the purpose of giving expert opinion at trial, but rather is a participant in the transaction that is the subject matter of the litigation." (*Hill*, 177 Ill. App. 3d at 58.) While defendants correctly point out that a party or an employee of a party may be an expert under the definition of that term in Rule 220(a)(1) (134 Ill. 2d R. 220(a)(1)), that provision, which provides the qualifications of expert witnesses, does

not pertain to the disclosure of such witnesses. (*Hill*, 177 Ill. App. 3d at 58, citing *Tzystuck*, 124 Ill. 2d at 233-34.) A party or employe of a party is in fact subject, however, to the expert witness discovery provision of Rule 220(c)(4), which gives an opposing party the opportunity to discover a party's or an employee's expert opinion. 134 Ill. 2d R. 220(c)(4); *Hill*, 177 Ill. App. 3d at 58.

■ Here, defendants' Rule 220 interrogatories to plaintiff specifically referenced and requested the identities and opinions of any party or employee. As such, plaintiff was obligated to disclose to defendants the identity of Bill Curran prior to trial. In this regard, Rule 220 provides a specific sanction if the identity of an expert is not properly disclosed. The rule states, "[f]ailure to make the disclosure required by this rule or to comply with the discovery contemplated herein will result in disqualification of the expert as a witness." (134 Ill. 2d R. 220(b)(1).) Since "[t]he only sanction provided for in Rule 220 is disqualification of the expert witness, and the trial court's discretion is thus severely limited" (*Phelps v. O'Malley* (1987), 159 Ill. App. 3d 214, 224), we must conclude that the trial court erred in allowing Bill Curran to testify.

That being said, however, we do not believe that the error in permitting Curran to testify requires that defendants be awarded a new trial. Rather, as stated in our discussion regarding sanctions under Rule 219, we believe the record demonstrates that Bill Curran's testimony was cumulative in nature and thus not such that its inclusion was especially prejudicial to defendants. (*Cf. Hatch v. Golden Rule Insurance Co.* (1990), 204 Ill. App. 3d 790, 796.) Therefore, since defendants were not thereby prejudiced, we consider any error to have been harmless and conclude that there is insufficient cause for reversal on this point.

Next, we consider defendants' argument that the trial court erred in allowing parol or extrinsic evidence to contradict the terms of the express contracts. In essence, it is defendants' position that the contracts at issue in this case are lump-sum fixed-price contracts and that Curran should therefore not have been allowed to introduce evidence contrary to the quantities and prices listed in those contracts. Curran, on the other hand, maintains that the contracts were not lump-sum or fixed-price contracts but rather were unit-price contracts whereby the unit prices of materials were fixed while the quantities of materials, having been derived from engineering estimates, were not.

Thus, though not articulated very clearly by the parties, we believe the primary issue in this regard to be whether the quantity and/or price terms in the contracts are ambiguous, and if so, what the

parties truly intended. The trial court should initially determine, as a matter of law, whether the language of a contract is ambiguous as to the parties' intent. (*Quake Construction, Inc. v. American Airlines, Inc.* (1990), 141 Ill. 2d 281, 288.) If no ambiguity exists, the parties' intent is to be derived by the trial court solely from the writing itself. (*Quake Construction*, 141 Ill. 2d at 288.) Where, however, the terms of the contract are ambiguous or capable of more than one interpretation, such that the true intent of the parties is in doubt, it becomes necessary to receive extrinsic evidence, and the question of the parties' intent becomes one of fact for the jury. (141 Ill. 2d at 288-89; *TDC Development Corp. v. First Federal Savings & Loan Association* (1990), 204 Ill. App. 3d 170, 175.) It has also been stated that the meaning of certain words raises a question of fact for the jury where the words concern estimates or probable amounts. *TDC Development*, 204 Ill. App. 3d at 178.

■ Here, although the trial court did not explicitly resolve the initial question of the existence of contractual ambiguity, we believe it is reasonable to infer that the court found such an ambiguity, based on certain instructions which were tendered to the jury. In this regard, we refer to the instructions wherein the court summarized the parties' positions on the issue of the quantity of materials to be used. The court instructed the jury that it was plaintiff's position that, pursuant to the contracts, defendants were to pay plaintiff on a unit-price basis. Defendants' position, while admitting that the parties had agreed on unit-price contracts, was that, relative to the quantities of materials, the parties agreed to the quantities either listed in the contracts or established in a 1986 engineering estimate. While plaintiff acknowledged that the engineering report and the contracts listed certain quantities, it maintained that those quantities were simply estimates to which plaintiff was not bound. Thus, the trial court treated the quantity language as ambiguous, since it presented the parties' conflicting arguments on that issue, in effect leaving the question of the parties' intent for the jury to decide.

In any event, we agree that the quantity and price language is ambiguous. The Phase II written contract, while indicating a total price, also provides for unit prices. In addition, the Phase II contract was plaintiff's proposal which set forth specifications and "estimates" of types and quantities of materials. The Phase III oral contract was to be based on the 1986 engineer's report. That report was entitled "Engineer's Opinion Of Cost For Engineering Improvements." Curran presented testimony that the engineer's estimate was given to the contractors so they could estimate the yardage on the project. Cur-

ran's expert witness, in explaining unit-price contracts, testified that a contractor is obligated to provide the paving as shown on the plans and as directed by the owner, and that the contractor is to be paid based on the unit prices in the contract. The expert added that, in this case, the quantities listed in the contracts were based on rough engineering estimates and were not binding.

We conclude that the quantity and price terms in the parties' contracts were capable of more than one interpretation. As such, the true intent of the parties was in doubt, and the trial court did not err in allowing into evidence certain extrinsic evidence which tended to explain those terms. (*Quake Construction*, 141 Ill. 2d at 288-89.) The question of intent was then presented to the jury which, as is apparent from its verdicts, adopted plaintiff's interpretation. Defendants also contend that the court erred in allowing Curran to introduce *quantum meruit* evidence in the face of express contracts. However, since Curran did not recover anything under either of the two counts which pleaded a *quantum meruit* theory, we need not address this issue further.

Finally, we consider defendants' contention that Curran failed to sustain its burden of proof on its claim for contract extras. As stated by Curran in its brief, count I of the second amended complaint, which sought payment for Phase III extras, is the only count based specifically on a claim for extras under which Curran recovered. In support of its claims in count I, Curran attached exhibits A and B to the complaint, which were invoices for the extra work allegedly performed during Phase III. At trial, Curran introduced these same invoices as plaintiff's exhibit Nos. 8 and 9. The invoices totalled $34,576.83.

■ The elements necessary to prevail on a claim for extras are set forth in the often-cited case of *Watson Lumber Co. v. Guennewig* (1967), 79 Ill. App. 2d 377. In order for a contractor to recover additional payment from an owner for extra work, he must establish by clear and convincing evidence that: (1) the work was outside the scope of the original contract; (2) the extra work was ordered at the direction of the owner; (3) the owner agreed either expressly or impliedly to pay extra; (4) the extra work was not voluntarily furnished by the contractor; and (5) the extra work was not rendered necessary by any fault of the contractor. (*Guennewig*, 79 Ill. App. 2d at 389-90.) We conclude that Curran has met its burden of proof on its claim for extras.

Quite relevant to the first three elements set forth in *Guennewig* is the following testimony of Gus Leakakos in response to questions from Curran's attorney:

"Q. And the work that Curran agreed to perform along Phase III, Maple Lane, was the same scope of work that was done along Phases I and II, correct? In other words, the stone base, the asphalt on top and the aggregate shoulders?

A. Right.

Q. Do you also agree with me that Curran performed work beyond the scope of these agreements, relating to the undercutting of the poor soil in order to prepare the sub-base for the weight of the asphalt?

A. I think there were a couple of soft spots there, yes.

Q. Those agreements to undercut the bad soil were not part of the three agreements we just talked about, is that correct?

A. No, no.

* * *

Q. *** I'll show you what I marked as Plaintiff's Group Exhibit No. 8, for identification. I ask you to review those documents. Have you reviewed them?

A. Yes.

Q. This group exhibit consists of eight separate invoices from Curran to the Townhomes of Woodland Hills, attention you, correct?

A. Correct.

* * *

Q. And each invoice has attached to it a written memorandum of work that was performed by Curran that you authorized and signed, correct?

A. Yes. That was the usual procedure. Your foreman would give me a ticket to sign before they commence doing the work.

* * *

Q. These particular invoices, Group Exhibit No. 8, those were related to—strike that.

These particular eight invoices and work orders related to work performed by Curran and authorized by you relative to Phase III, that was undercutting work, over and above pavement contracting, is that right?

A. Yes. Those were extras I agreed to.

* * *

MR. McARDLE: Q. I show you what I marked as Plaintiff's

Group Exhibit No. 9, for identification, and ask you to review these documents as well.

THE WITNESS: A. All right.

Q. Plaintiff's Group Exhibit No. 9 are five separate invoices from Curran Contracting to you, dated August 26, 1986, correct?

A. Correct.

* * *

MR. McARDLE: No. 9, Group. Five separate invoices. Once again, this was for work that was performed by Curran that was over and above the pavement agreement on Phase III relative to undercutting, correct?

THE WITNESS: A. Right.

Q. Attached to each of these invoices are similar memorandas [sic] authorized by Peter Longson on your behalf authorizing Curran to do the work, right?

A. Right."

From the above, it is clear to this court that the first element, that the work was outside the scope of the contract, was admitted by Leakakos. The same is true for elements two and three, that the extra work was ordered by the owner and that the owner agreed either expressly or impliedly to pay extra, in that Leakakos stated that he authorized and agreed to the extras referenced in plaintiff's exhibit Nos. 8 and 9. In addition, Shirley Glasspool, Woodland's secretary and bookkeeper, answered in the affirmative when asked by defendant's attorney whether, besides the contract paving work, Woodland "also requested Curran to perform undercutting or extra work on the project," as represented by plaintiff's exhibit Nos. 8 and 9. Finally, defendants in their answer to plaintiff's second amended complaint admitted "that Woodland requested Curran to perform some excavation work to prepare the road surface in Phase III."

We believe that Curran also established the fourth and fifth elements, that the extras were not furnished voluntarily by the contractor and that the extra work was not rendered necessary by the fault of the contractor. As to the fourth element, Leakakos admitted that the undercutting work was performed due to the existence of poor soil or soft spots. We believe, therefore, that it is reasonable to infer that the work was necessary and was not simply a voluntary act on the part of Curran. As to the fifth element, Curran correctly notes that Charles Gaumer testified to the effect that, *prior* to performing its Phase III paving contract, Curran tested the sub-base of the roads

and found that it was soft in some areas, necessitating the undercutting work.

■ Based on our review of the record, therefore, we conclude that Curran has proved its claim for Phase III extras by clear and convincing evidence. Defendants also argue that the claim for interest contained in count V of Curran's complaint was never proved with respect to the date at which the alleged right to such interest could be said to accrue. As to this contention, we note that defendants have failed to adequately brief the issue in violation of Supreme Court Rule 341(e)(7) (134 Ill. 2d R. 341(e)(7)). Defendants failed to cite any authority in support of their conclusory argument consisting of but two sentences. Such an argument may be considered waived, and we so consider it. *Dillard v. Kean* (1989), 183 Ill. App. 3d 28, 31; *Coleman v. Windy City Balloon Port, Ltd.* (1987), 160 Ill. App. 3d 408, 418.

For all of the foregoing reasons, we affirm the judgment of the circuit court of Lake County.

Affirmed.

McLAREN and NICKELS, JJ., concur.